IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : |
| Plaintiff, | : Civil Action No. |
| v. | : : |
| OPTIMUM INCOME PROPERTY, LLC, OPTIMUM PROPERTY INVESTMENTS, LLC, and FRANK E. LLERAS, | : : : : |
| Defendants. | : : |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Securities and Exchange Commission ("Commission"), files its complaint and alleges that:

## OVERVIEW

1. From at least March 2012 through the fall of 2014, Frank E. Lleras ("Lleras") and two Charlotte, North Carolina-based companies that he controls, Optimum Income Property, LLC and Optimum Property Investments, LLC (collectively, "Optimum"), conducted an offering fraud that targeted investors in the Dominican Republic and raised more than $2.9 million from at least twenty-five victims.

2. Lleras solicited money from investors by representing, both orally and in a written agreement with investors, that he would use the funds to purchase residential homes and condominiums located in Charlotte.

3. Lleras further represented to investors that he would renovate and resell, or rent, the properties he purchased for substantial profit and take as his fee a percentage of the investors' net profit.

4. Lleras's investment contracts were securities and his representations to investors were false.

5. Within days of receiving investor funds, Lleras misappropriated large portions of those funds for his own benefit. Lleras diverted investor funds to support his personal lifestyle, including paying more than $1.1 million in credit card charges; making numerous purchases at luxury retailers; and conducting hundreds of smaller, personal transactions.

6. Lleras concealed his scheme, and induced additional investments, by giving investors fake documents, including forged deeds and fictitious property tax receipts, concerning properties that he falsely told them they owned.

7. With respect to at least three properties, Lleras provided fake deeds to investors falsely showing that they owned properties that Optimum itself wholly owned.

8. Lleras also provided investors with fake quarterly account statements that listed the properties supposedly owned by an investor, as well as income from the sale or rental of the property, Optimum's management fees, and unrealized profits.

9. These fake documents lulled investors into a false sense of security, and enticed several investors to make additional investments with Lleras.

10. Beginning in late 2014, after being confronted by a few investors who questioned their returns, Lleras confessed that he had defrauded investors and admitted to several investors that he had used funds for impermissible purposes.

## VIOLATIONS

11. Defendants have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

12. The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from

engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties and for other equitable relief.

13. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

14. Defendants, directly and indirectly, made use of the mails, the means and instruments of transportation and communication in interstate commerce and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint and made use of mail and means of instrumentality of interstate commerce to effect transactions, or to induce or to attempt to induce the purchase or sale of securities alleged in this complaint.

15. Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Western District of North Carolina. In addition, Lleras resides in the Western District of North Carolina and directed the operations of Optimum from the Western District of North Carolina.

16. Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

**THE DEFENDANTS**

17. Optimum Income Property, LLC ("Optimum Income") is a Florida limited liability company formed by Lleras in 2013. It currently is listed on the Florida Department of State Division of Corporations' website as "Inactive." Lleras portrayed Optimum Income as a private real estate investment company that handled all aspects of real estate investing for investors.

18. Optimum Property Investments, LLC ("Optimum Property") is a North Carolina limited liability company formed by Lleras in 2009. The nature of the Optimum Property business is described as "real estate investments" in filings with the North Carolina Secretary of State.

19. Frank Lleras is the control person of Optimum and signed agreements with investors on its behalf.

## THE FRAUDULENT SCHEME

20. From at least March 2012 through the fall of 2014, Lleras raised more than $2.9 million from at least twenty-five investors in the Dominican Republic.

21. Lleras solicited investors to give him money by representing to them that he would use their funds to purchase residential homes and condominiums in Charlotte, many of which had fallen into foreclosure or otherwise were distressed, from Fannie Mae, Freddie Mac, and Bank of America.

22. Lleras told investors that the opportunity to purchase the properties stemmed from his contacts with Bank of America.

23. Lleras further told investors that, after purchasing the properties, he would either renovate and sell the properties for profit or rent the properties to generate income for investors.

24. Lleras outlined to investors a process whereby he would form a limited liability company ("LLC") in each investor's name, and then open an account in the LLC's name at Bank of America.

25. Lleras told investors that after they wired funds into the LLC bank accounts, he would use the funds to purchase and title properties in the names of the LLCs. He explained to the investors that the LLC structure was necessary because the

investors were not U.S. citizens, and that using the LLCs would minimize their tax burden. The LLCs were formed by Lleras in North Carolina.

26. At least twenty-five investors ultimately invested more than $2.9 million in Lleras's fraudulent scheme.

27. The investors primarily consisted of physicians residing and practicing in the Dominican Republic, many of whom were friends or professional acquaintances with Lleras's father-in-law.

28. Each investor entered an Agency Agreement with Optimum. These agreements provided that they were governed by North Carolina state law and that any litigation arising out of the agreements was to take place in North Carolina.

29. Although the agreement was drafted to suggest that the client was selecting a specific property to purchase from a few presented by Lleras and allowed the client to discontinue Optimum services, in reality these powers were illusory and the investors were reliant on Lleras to perform all essential management functions with regard to the investment.

30. The information that Lleras gave investors to choose a property was minimal, typically including a photograph, the purchase price, and Lleras's projected return on investment.

31. Moreover, the investors were foreign nationals residing outside the United States, most with limited English language skills and no experience in purchasing, renting, or reselling real estate in the United States.

32. The investors relied wholly on Lleras and Optimum's efforts to identify appropriate properties, renovate those properties, and then make a profit by reselling or renting the properties.

33. Optimum was responsible for all essential functions of the investment, including the acquisition and maintenance of the properties.

34. Additionally, investors relied on Lleras to decide whether and when to rent or sell the properties.

35. The agreement also detailed Optimum's compensation and provided that Optimum was entitled to ten percent of net profit from rent, and, upon sale of the property, between five and fifteen percent of the resulting net profit along with a three-percent sales commission.

36. Defendants' profits were dependent upon the return on the investments made by the individual investors.

37. After the investors wired funds to their LLC accounts, Lleras provided them with purported property deeds and property tax payment receipts for the properties that they believed they owned.

38. Lleras also provided investors with quarterly account statements, which listed the properties purportedly owned by the investors, as well as income from the sale or rental of the properties, Optimum's management fees, and unrealized profits.

39. Contrary to Lleras's representations, investor funds were not used to buy investment properties for investors, but instead were used for Lleras's personal or unrelated business expenses.

40. Lleras's personal use of investor funds was contrary to the written and oral representations he made that investor funds would be used solely for purchasing, renovating, and maintaining real estate properties for investors.

41. Lleras received more than $2.9 million of investor funds. Instead of purchasing properties, as he represented he would do, he (i) used more than $1.1 million to pay bills from American Express; (ii) made purchases at luxury retailers, such as Cartier, Louis Vuitton, and Christian Louboutin; and (iii) conducted hundreds of smaller transactions that clearly were personal in nature (*e.g.*, purchases at Bye Bye Baby, PetSmart, Starbucks, and Victoria's Secret).

42. Lleras also provided fake documents to investors to cover up the scheme, assure them that their investments were secure, and induce them to make additional investments.

9

43. First, Lleras provided investors with deeds for properties that he claimed to have purchased in their LLCs' names. Lleras, however, ultimately admitted to several investors that he had forged the deeds.

44. At least twelve deeds provided to investors were fabricated. With respect to at least three properties, Lleras provided fake deeds to investors falsely showing that they owned properties that Optimum itself wholly owned.

45. Second, Lleras provided to investors fake receipts purporting to show the payment of property taxes on the properties. Because the LLCs did not own the properties, however, no tax payments were owed or made in their names.

46. Finally, Lleras provided false quarterly account statements to investors. The statements listed specific properties that composed the investors' portfolios, as well as income from the sale or rental of the properties, Optimum's management fees, and unrealized profits along with updated and projected returns.

47. These account statements listed information concerning properties and resulting income and profits for properties that the investors did not own.

48. The experiences of two investors in Lleras's scheme are illustrative. First, Investor A, a doctor in the Dominican Republic, invested approximately $290,000 with Lleras and Optimum in order to purchase properties in Charlotte.

49. Investor A first met Lleras in March 2012 when Lleras traveled to the Dominican Republic to solicit investors and explain the Optimum investment opportunity.

50. Lleras told Investor A that first he would create an LLC in the name of the investor and open a Bank of America account in the name of the LLC. Lleras then said he would purchase bank-owned properties in the investor's LLC name, and either manage the rental of the property or make repairs to the property and sell it at a profit.

51. Lleras guaranteed a thirty-percent profit to the investor for the resale of property. In return, Lleras would keep as his profits five percent of rental income and between five and fifteen percent of net profit of any resale.

52. Based on Lleras's representations, Investor A entered into an Agency Agreement with Optimum and, on July 4, 2012, wired approximately $86,000 from his bank in the Dominican Republic to his newly opened Bank of America account in the name of a LLC Lleras created on Investor A's behalf.

53. Investor A wired the funds to purchase two specific properties identified to him by Lleras. Subsequently, Lleras provided Investor A with a deed for one of the properties that listed Investor A's LLC as the owner of record. This deed was fabricated.

54. Investor A, unaware that the deed was fabricated and comforted by this purported evidence of his ownership of the property, agreed to invest more money with Lleras to purchase additional proprieties. In 2013 and 2014, Investor A wired funds on at least three occasions totaling more than $200,000, so that Lleras could purchase four additional properties on his behalf.

55. Despite Lleras's representations, Investor A never had title to at least two of these properties.

56. Investor B, also a doctor in the Dominican Republic, invested approximately $177,000 with Lleras and Optimum for the purchase of properties in Charlotte.

57. In approximately 2013, Investor B attended a presentation by Lleras in the Dominican Republic during which Lleras described the opportunity to invest in real estate properties in Charlotte through Optimum.

58. Lleras told Investor B that first he would create an LLC in the name of the investor and open a Bank of America account in the name of the LLC. Lleras then said he would purchase bank-owned properties in the investor's LLC name, and either manage the rental of the property or make repairs to the property and sell it at a profit.

59. Based on Lleras's representations, Investor B invested approximately $177,000 with Optimum in three separate transactions. Lleras subsequently

12

provided two deeds to Investor B that listed Investor's B's LLC as the lawful owner of the properties. Again, the deeds were fabricated.

60. In late 2014, several investors became concerned about their investments with Lleras because expected rental payments and profits from sales of properties did not appear in their accounts and online portfolios.

61. Beginning in late 2014, Lleras admitted on several occasions that he defrauded investors.

62. For example, Lleras confessed to family members that he had not purchased properties for investors as he said he would do, had liquidated properties purchased for investors without their knowledge, and had diverted investor funds for other business purposes.

63. Also, on December 2, 2014, Lleras executed an agreement between Optimum and three of the investors acknowledging his debt to all of the investors. He confirmed that Optimum owed the investors more than $2.9 million, and promised to provide them with a promissory note in that amount with a maturity date of February 27, 2015, as well as a personal guarantee from him and his wife with respect to the note. Lleras also agreed to assign deeds and other interests to the investors to secure the note.

64. Additionally, when confronted by investors, Lleras confessed that he took their funds to pay for other business liabilities.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

65. Paragraphs 1 through 64 are hereby re-alleged and are incorporated herein by reference.

66. From at least March 2012 through the fall of 2014, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

67. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

68. While engaging in the course of conduct described above, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

69. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

# COUNT II—FRAUD

## Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
## [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

70. Paragraphs 1 through 64 are hereby realleged and are incorporated herein by reference.

71. From at least March 2012 through the fall of 2014, Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

    a. obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b. engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

72. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

# COUNT III—FRAUD

## Violations of Section 10(b) of the Exchange Act
## [15 U.S.C. § 78j(b)]and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

73. Paragraphs 1 through 64 are hereby re-alleged and are incorporated herein by reference.

74. From at least March 2012 through the fall of 2014, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a. employed devices, schemes, and artifices to defraud;

    b. made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c. engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

75. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants acted

with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

76.     By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commission respectfully prays for:

### **I.**

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendants named herein committed the violations alleged herein.

### **II.**

Permanent injunctions enjoining Defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

17

Case 3:16-cv-00073-RJC-DCK   Document 1   Filed 02/10/16   Page 17 of 19

**III.**

An order requiring the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

**IV.**

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against Defendants.

**V.**

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

Plaintiff requests a jury trial.

Dated: February 10, 2016

                                              Respectfully submitted,

                                              */s/ Kristin W. Murnahan*
                                              M. Graham Loomis
                                              Regional Trial Counsel
                                              Georgia Bar No. 457868

Email: loomism@sec.gov

Tel: (404) 842-7622
Kristin W. Murnahan
Senior Trial Counsel
Georgia Bar No. 759054
Tel: (404) 842-7655
Email: murnahank@sec.gov

COUNSEL FOR PLAINTIFF
Securities and Exchange Commission
950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, Georgia 30326
Tel: (404) 842-7600
Fax: (703) 813-9525